JOHN MUIR MEMORIAL HOSPITAL,
INC., A California non-profit
corporation, Plaintiff,

v.

Carolyne K. DAVIS, Ph.D., Administrator
of the Health Care Financing
Administration, Defendant.

MT. DIABLO HOSPITAL DISTRICT,
d/b/a Mt. Diablo Hospital Medical
Center, Plaintiff,

v.

Carolyne K. DAVIS, Ph.D., Administrator
of the Health Care Financing
Administration, Defendant.

Nos. C–81–4731 EFL, C–81–4732 EFL.

United States District Court,
N.D. California.

Feb. 17, 1983.

George C. Stoll, U.S. Atty., San Francisco, Cal., for defendant.

Patric Hooper and David Neiger, Los Angeles, Cal., for plaintiffs.

## MEMORANDUM OF DECISION

LYNCH, District Judge.

This matter came on for hearing on August 25, 1982 on the parties' cross-motions for summary judgment. The above-entitled cases were related and both involve judicial review of a final decision of the Administrator of the Health Care Financing Administration ("Administrator")[1] denying Medicare reimbursement to the plaintiff non-profit hospitals. Both hospitals challenge the Administrator's refusal to allow reimbursement of Hill-Burton free care costs. Mt. Diablo alone challenges the Administrator's decision to include labor/delivery room days in the computation of the average cost per diem for routine services.

This Court has jurisdiction of the subject matter pursuant to 42 U.S.C. § 1395oo(f) which mandates District Court review, applying the provisions of the Administrative Procedure Act, 5 U.S.C. § 701, et seq. Section 706 of 5 U.S.C. requires this Court to "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...." 5 U.S.C. § 706(2)(A); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 130 (9th Cir.1980).

Plaintiff non-profit hospitals are qualified providers of medical services under the Medicare provisions of the Social Security Act, 42 U.S.C. § 1395, et seq. and, as such, are entitled to be reimbursed for the reasonable costs of services provided to Medicare beneficiaries. 42 U.S.C. § 1395f(b).[2] The regulations detail the nature of reasonable costs to be paid to hospitals for providing patient care services. 42 C.F.R. § 405.-401, et seq. These regulations provide reimbursement for costs directly related to patient care services. Also allowed is reimbursement of *indirect* costs required for patient care, such as depreciation on hospital buildings. See C.F.R. § 405.415.

The statute authorizes the appointment of certain private agencies as "fiscal intermediaries" which review the hospitals' claims for costs and which administer payments due hospitals from the government. 42 U.S.C. § 1395h. Blue Cross Association acts as the intermediary for both plaintiffs. In its calculations, the intermediary required Mt. Diablo to include labor/delivery room patient days in the computation of the average cost per diem for routine services.

Blue Cross Association also excluded from allowable costs Mt. Diablo's and John Muir's costs of rendering uncompensated care to indigents pursuant to their Hill-Burton obligations.

Plaintiffs appealed the intermediary's actions to the Provider Reimbursement Review Board (PRRB), a tribunal of cost reimbursement experts, pursuant to 42 U.S.C. § 1395oo. After a full hearing on the Hill-Burton issue and a review of the administrative record of the labor/delivery room issue, the PRRB reversed both determinations of the Blue Cross Association.

On his own motion, the Secretary, through his delegate, the Administrator, elected to review the PRRB's decisions pursuant to 42 U.S.C. § 1395oo(f). On November 12, 1981, the Administrator re-

1. The term "Administrator" is used interchangeably with "Secretary", referring to the designate of the Secretary of the Department of Health and Human Services.

2. A "reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A).

versed the PRRB's rulings on the Hill-Burton issue and on the labor/delivery room issue.

## HILL–BURTON ISSUE

■ The Hill-Burton Act, 42 U.S.C. § 291, *et seq.,* provides grants or interest subsidies to hospitals for hospital construction expansion or modernization. As a condition of this governmental assistance, the hospital must agree to provide a certain amount of free medical care to indigents. 42 U.S.C. § 291(c). Accepting this assistance creates a legally enforceable free care obligation. *Saine v. Hospital Authority of Hall County,* 502 F.2d 1033, 1034–35 (5th Cir.1974); *Euresti v. Stenner,* 458 F.2d 1115, 1118–9 (10th Cir.1972).

Both hospital plaintiffs have received Hill-Burton grants and elected to meet their twenty-year free care obligation by providing services to indigents at a level equal to ten percent of total Hill-Burton assistance. *See* 42 C.F.R. § 53.111(d); 42 C.F.R. § 53.111(a).

The courts are split over whether these Hill-Burton free care costs are reimbursable under Medicare as indirect costs.

This Court disagrees with the defendant that *Presbyterian Hospital of Dallas v. Harris,* 638 F.2d 1381 (5th Cir.1981), *cert. denied,* 454 U.S. 940, 102 S.Ct. 476, 70 L.Ed.2d 248 (1981) is wrongly decided. Rather, this Court finds that case to be well-reasoned authority and agrees that

> "the free care expenses incurred by the Hospital[s] in connection with ... [their] obligations under the Hill-Burton Act were reasonable costs of providing care to all of its patients, including medicare patients, and are consequently reimbursable to the extent that this indirect cost benefited medicare patients."

*Presbyterian, supra* at 1387.

The regulations provide reimbursement for a number of specific indirect costs. *See* C.F.R. § 405.401, *et seq.* Notably, an inter-est payment actually made by the hospital to a lender of funds is reimbursable. 42 C.F.R. § 405.419(b). This Court cannot logically distinguish free care costs, which clearly indirectly benefit Medicare patients through enhancing hospital construction and modernization, from the other allowable indirect costs. *See Presbyterian, supra* at 1387.

■ The Court rejects the Government's claim that allowing reimbursement of the Hill-Burton costs confers a double benefit upon the hospital. The legislative history of the Hill-Burton Act evinces a Congressional desire to promote hospital construction and modernization—not a scheme to force hospitals to pay the cost of free health care. *See* Note, "The Hill-Burton Act, 1946–1980: Asynchrony In the Delivery of Health Care to the Poor," 39 Md.L.Rev. 316 (1979). Further, the Medicare reimbursement funds two distinct costs, each separately incurred by Hill-Burton hospitals: (1) construction costs, and (2) financing costs.

■ Nor is the free health care provided by Hill-Burton hospitals excluded from reimbursement as a "charity allowance." *See* 42 C.F.R. § 405.420(2). Once a hospital accepts a Hill-Burton grant, it is legally bound to provide free health care and may be penalized for its failure to do so. 42 C.F.R. §§ 124.606 and 124.607(b); 42 C.F.R. § 53.111(a).

■ Accordingly, this Court finds itself persuaded by the Fifth Circuit's logic in *Presbyterian* and inclined to find that Hill-Burton free care costs are reimbursable indirect costs. However, subsequent to the argument on this issue, President Reagan signed into law the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248 (1982), which in Section 106 amends 42 U.S.C. § 1395x(v)(1) and prohibits the inclusion of Hill-Burton free care costs in the category of reimbursable costs.[3] The last

---

3. The amendment to 42 U.S.C. § 1395x(v)(1) is set forth in Section 106 of H.R. 4961 as follows:

> Sec. 106. (a) Section 1861(v)(1) of the Social Security Act is amended by adding at the end the following subparagraph:

> "(M) Such regulations shall provide that costs respecting care provided by a provider of services pursuant to an assurance under Title VI or XVI of the Public Health Service Act that the provider will make available a

Congress by this legislation signaled its disagreement with the *Presbyterian* decision. *Arlington Hospital v. Schweiker,* 547 F.Supp. 670, 674 (E.D.Va.1982).

While the propriety of allowing the present legislative intent to apply retroactively is unclear at this time, this Court feels that it is bound by the new legislation to grant the Government's motion for summary judgment.

## LABOR/DELIVERY ROOM DAYS

The Secretary counts patients in a hospital's labor/delivery room area as if they were located in the hospital's separate routine care area for purposes of computing Medicare reimbursement. This method is employed pursuant to Health Insurance Manual 15 (HIM–15) § 2345. Plaintiff Mt. Diablo Hospital contends that this method is irrational, arbitrary and capricious. Defendant argues that the procedure is rational in light of the short time a patient is usually in the labor/delivery area of the hospital.

Since it was deemed infeasible for Medicare to determine the actual cost of the unique services rendered to each beneficiary, the Secretary developed methods of determining costs based on departmental averages. The averages are computed by first allocating costs to the various departments in which specific types of service are rendered. 42 C.F.R. § 405.452. There is no controversy here regarding the propriety of the Secretary's method. The dispute involves how allowable costs should be allocated to the various hospital departments and apportioned between Medicare and non-Medicare patients.

The amount of Medicare reimbursement for services provided by a hospital is calculated by apportioning the cost between Medicare and non-Medicare patients. 42 C.F.R. § 405.452. The cost of "routine services"[4] must be calculated under the procedure. An average cost per diem is then ascertained by dividing the total number of inpatient days into the total cost of providing the routine services. 42 C.F.R. § 405.452(d)(7). Apportionment is then accomplished by multiplying the average cost per diem by the number of days of care rendered to Medicare beneficiaries. 42 C.F.R. § 405(d)(2) and (7). This seemingly confusing procedure is best clarified by way of example. Assume that there are ten patients in the routine care area of the hospital—five Medicare patients and five non-Medicare patients. The total daily cost of routine care is $1,000, which translates to $100 per patient per day. Since there are five Medicare patients, Medicare reimburses the hospital for $500 of the total routine costs. Thus, Medicare reimburses 50% of the costs and 50% of the routine care patients are Medicare patients. Plaintiff, Mt. Diablo, acknowledges the fairness of this system.

Under the Secretary's procedure, routine patient days are counted for patients located in ancillary areas at the census-taking hour.[5] Plaintiff does not challenge the propriety of the census-taking procedures nor the manner of charging for ancillary areas generally.

Since at least 1977,[6] the Secretary has included patient days in the labor/delivery

---

reasonable volume of services to persons unable to pay therefor, shall not be allowed as reasonable costs."

(b) The amendment made by subsection (a) shall be effective with respect to any costs incurred under title XVIII of the Social Security Act, except that it shall not apply to costs which have been allowed prior to the date of the enactment of this Act pursuant to the final court order affirmed by a United States Court of Appeals.

H.R. 4961, 97th Cong., 2d Sess., 128 Cong.Rec., No. 113, part II, pp. H6171–6172 (8/17/82); H.R.Rep. No. 97–160, p. 15 (1982).

**4.** "Routine Services" include "the regular room, dietary and nursing services, minor medical and surgical supplies, and the use of the equipment and facilities for which a separate charge is not customarily made." 42 C.F.R. § 405.452(d)(2).

**5.** At Mt. Diablo Hospital the census-taking hour is midnight.

**6.** Plaintiff Mt. Diablo contends that HIM–15 § 2345 represented a change in the Secretary's policy from one of exclusion of labor/delivery room days from routine care costs to one of inclusion. The Government argues that HIM–

area of the hospital in the computation of the average cost per diem for general routine services. As will be shown, the overall effect of this procedure is to decrease the Medicare reimbursement to the hospital.

The labor/delivery room is a separate area of the hospital where an expectant mother is taken upon arrival to the hospital. If delivery appears likely, the woman remains in that area until after delivery. The length of time a woman spends in the labor/delivery room generally ranges from two to 24 hours. While in the labor/delivery area, these patients are receiving no routine care. Rather, all costs are allocated to that area. Very few of the labor/delivery room patients are Medicare patients.

The impact that the Secretary's procedure has upon the amount of Medicare reimbursement a hospital receives is best shown by another example. In addition to the ten patients in the routine care area at the census-taking hour (five Medicare and five non-Medicare) referred to in the prior example, assume two non-Medicare patients in the labor/delivery area at the census-taking hour. Under the Secretary's method, 12 patients would be deemed to be in the routine care area at the census-taking hour. The routine costs—$1,000—would remain constant, but the cost per patient would be decreased since the denominator is increased. Thus, the costs ($1,000) divided by the number of patients (12) would result in slightly above $83 per patient per day. Under this method, the hospital receives about $83 rather than $100 per Medicare patient.

The Government contends that this method is neither irrational, arbitrary nor capricious. It notes that other ancillary areas are treated in the same manner (e.g., an operating room) and that the Secretary's system for apportioning costs according to a per diem calculation is necessary. The Government contends that it is rational to treat the labor/delivery room patient who just happens to be in that area at the midnight census-taking hour as a routine

patient because in nearly every case she will be a routine patient within 24 hours.

Plaintiff does not challenge the census-taking procedure which the Secretary has created. Instead, plaintiff contends that the labor/delivery area should not be treated the same as other ancillary areas since the other areas are rarely in use during the midnight census-taking hour, are used in a roughly proportionate amount by Medicare and non-Medicare patients and are used primarily by patients who are formally admitted to a routine area room before using the ancillary area or who have an assigned routine room awaiting them. Mt. Diablo's sole argument is that those patients who are not admitted to a routine area between the time of their admission to the labor/delivery room area and the midnight census-taking hour should not have a routine day counted for them. Plaintiff concedes that if the patient is transferred to the routine area prior to the census-taking hour, a routine day should be counted regardless of the number of hours that that patient spent in the labor/delivery room area or in the routine area during that first day.

■ This Court finds the logic of plaintiff's argument highly persuasive. Where, as here, no routine room is assigned nor reserved for a patient while she is in the labor/delivery room area, the expectant mother is not formally admitted to a routine area room until after leaving the labor/delivery room area and no routine costs are incurred for the patient until she leaves the labor/delivery room area, this Court finds it is "arbitrary, capricious, [and] an abuse of discretion" for the Secretary to include labor/delivery costs in these calculations of routine care costs. 5 U.S.C. § 706(2)(A).

■ In so holding, this Court acknowledges its obligation to give substantial deference to the interpretation given a statute by the officers charged with its administration. *Udall v. Tallman*, 380 U.S. 1, 16, 85

15 § 2345 was simply a clarification of existing procedure. This Court declines to reach this issue.

S.Ct. 792, 801, 13 L.Ed.2d 616 (1975). Deference is particularly common in the complex area of Medicare reimbursement. *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980).

Deference, however, is not a euphemism for judicial abdication. As the Ninth Circuit explained,

> The deference which a reviewing court is to afford to an agency's interpretation of its regulations is not total, however. Congress has vested in the court a reviewing function over the action of the agency, including its interpretative decisions. 42 U.S.C. § 1395oo(f), 5 U.S.C. §§ 701–706. We would be abdicating our judicial responsibility if we were to pass on the propriety of the Secretary's interpretation without subjecting it to some degree of scrutiny. As where courts review an agency's construction of a statute which the agency administers, "the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia ...." *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965); *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). Even though the Medicare reimbursement area is complex, and to a great degree left to the Secretary to structure, his interpretations are nonetheless subject to our examination.

*Pacific Coast Medical,* 633 F.2d at 131 (footnotes omitted). As stated earlier, this Court is directed to "hold unlawful and set aside agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Accordingly, for the above-stated reasons, this Court grants Mt. Diablo's motion for summary judgment on the labor/delivery room issue.

IT IS SO ORDERED.