VISTA HILL FOUNDATION, INC., a non profit corporation dba Vista Hill Hospital, Mesa Vista Hospital and Vista Sandia Hospital, Plaintiff-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 84–6136.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1985.

Decided July 29, 1985.

Wiggins, Circuit Judge, concurred in part and dissented in part with opinion.

Patric Hooper, Weissburg & Aronson, Inc., Los Angeles, Cal., for plaintiff-appellant.

Michael R. Power, San Francisco, Cal., for defendant-appellee.

Before GOODWIN, REINHARDT, and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

Vista Hill Foundation ("Vista Hill"), which owns three acute psychiatric facilities, appeals from a summary judgment upholding the Secretary of Health and Human Services' decision to deny Medicare reimbursement for the costs that the facilities incurred in furnishing mandated educational services to their pediatric patients. Because we find that the services are related to treatment and the costs are not otherwise excludable from those that must be reimbursed by Medicare, we reverse.

## I. BACKGROUND

This appeal involves Part A of the Medicare Program, created by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (1982). Part A covers the expenses of inpatient hospital care. Hospitals that participate in the Medicare program are designated "providers of services" and are paid the "reasonable costs" of appropriate services rendered to Medicare patients. Reasonable costs are defined as the direct and indirect costs actually incurred by a provider, excluding costs found to be unnecessary to the efficient delivery of needed health services. 42 U.S.C. § 1395x(v)(1)(A) (1982). Congress delegated to the Secretary the authority to further define "reasonable costs" by regulation, *id.*, and in her regulations the Secretary has specified that "reasonable costs" are those that are the "necessary and proper costs incurred in rendering the services." 42 C.F.R. § 405.-451(a) (1984). The regulations go on to define necessary and proper costs as those "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." *Id.* § 405.451(b)(2).

Vista Hill, a Medicare provider, owns three inpatient psychiatric facilities that serve children as well as adults. The children suffer primarily from schizophrenia, major depression, and serious conduct disorders. According to the only expert who testified, Dr. Robert A. Moore, the children's illnesses have a "very close relationship" with their schooling, and "a very important part of their treatment is to learn to do the job of going to school and to learn to do the job of learning." The educational services in question are, therefore, provided as part of the active hospital treatment program for 95% of the patients under 18 years of age. The young patients receive educational services for approximately 15 to 20 hours a week.

Vista Hill contends that the educational services are a routine form of treatment and that, as such, their costs are covered by Medicare. The Medicare fiscal intermediary, the entity that first determines

whether costs are ·reimbursable,[1] found that that they are not covered. The Provider Reimbursement Review Board ("PRRB" or "Board") affirmed the intermediary's disallowance,[2] determining (a) that the services are not "an integral part of the therapy modality," and (b) that education programs are the responsibility of local school districts. The district court agreed that the costs in question are not reimbursable. However, the district court did not rely on either of the grounds on which the Board based its decision. Instead, the district court found that the services are not routine for *Medicare patients.* Accordingly, it reasoned, the costs of the services cannot be apportioned between Medicare and non-Medicare patients under the system used to apportion routine costs. Vista Hill contends that the Secretary's denial of routine-cost reimbursement for these necessary and proper costs was arbitrary and capricious.

## II. STANDARD OF REVIEW

We normally affirm a district court's grant of summary judgment if the record establishes any basis that supports the order. *Jewel Companies v. Pay Less Drug Stores Northwest, Inc.,* 741 F.2d 1555, 1564–65 (9th Cir.1984). However, an agency's decision can be upheld only on a ground upon which it relied in reaching that decision. *Memorial, Inc. v. Harris,* 655 F.2d 905, 911 (9th Cir.1980); *see generally American Textile Manufacturers Institute v. Donovan,* 452 U.S. 490, 539, 101 S.Ct. 2478, 2505, 69 L.Ed.2d 185 (1981)

("the *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency· action"). Accordingly, we can affirm the district court's summary judgment order only if we conclude that the PRRB's decision was justified on either of the two grounds set forth in that decision. *See SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459–460, 87 L.Ed. 626 (1943).

■ In reviewing the Secretary's decisions, we are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (1982). We cannot uphold the agency's determinations if they are "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Villa View Community Hospital, Inc. v. Heckler,* 720 F.2d 1086, 1090 (9th Cir.1983) (citing 5 U.S.C. § 706(2) (1982)); *White Memorial Medical Center v. Schweiker,* 640 F.2d 1126, 1129 (9th Cir. 1981).

■ We give deference to the Secretary's interpretation of her own regulations "where [s]he has expertise in the substantive area involved and where the regulations were promulgated pursuant to congressional authorization." *Villa View,* 720 F.2d at 1090; *accord White Memorial,* 640 F.2d at 1129. However, "[t]he interpretation must sensibly conform to the purpose and wording of the regulations." *Villa View,* 720 F.2d at 1090 (quoting *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir.1980)). Because the Secretary's interpretations of her regula-

1. The Medicare program authorizes hospitals to appoint certain private agencies (such as Blue Cross) as "fiscal intermediaries" to act as agents of the Secretary of Health and Human Services for purposes of reviewing hospital reimbursement claims. The intermediary audits an annual cost report filed by a provider, 42 C.F.R. §§ 405.406(b) & 405.453(f) (1984), and then issues a written notice of the approved amount of reimbursement, *id.* § 405.1803(a).

2. Providers dissatisfied with the amount of reimbursement approved by the intermediary may appeal the determination to the PRRB if the amount in controversy exceeds $10,000. 42 U.S.C. § 1395*oo* (a) (1982). If the Secretary is

dissatisfied with the PRRB's determination, the Deputy Administrator of the Health Care Financing Administration may review the PRRB's decision on her behalf pursuant to 42 U.S.C. § 1395*oo* (f)(1) (1982). The Deputy Administrator's determination, if any, or the final decision of the PRRB—if not reviewed by the Deputy Administrator—is considered the Secretary's final decision and is reviewable by the district court pursuant to 42 U.S.C. § 1395*oo* (f) (1982). *See generally Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 318 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 126–27 (9th Cir.1980).

tions are without force of law, although they are entitled to some deference, we must consider them with caution. *Moody Nursing Home, Inc. v. United States,* 621 F.2d 399, 402 (Ct.Cl.1980). We will not uphold them if their application produces a result inconsistent with the statute and regulations. *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 325 & n. 16 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Saint Mary of Nazareth Hospital Center v. Schweiker,* 718 F.2d 459, 464 (D.C.Cir.1983); *Advanced Health Systems, Inc. v. Schweiker,* 510 F.Supp. 965, 969 (D.Colo.1981).

## III. THE THERAPEUTIC VALUE OF THE EDUCATIONAL SERVICES

The PRRB determined that the educational services in question are not "an integral part of the therapy modality."[3] This finding is not supported by substantial evidence. The only evidence presented to the Board about the nature of the services was the testimony of Dr. Moore. According to Dr. Moore, the educational services are as much a part of therapy as are other routine covered services such as group therapy and recreational therapy. Like other forms of treatment, they are integrated into each child's individualized treatment program. An assessment of a child's intellectual development and a scholastic achievement evaluation are made when he or she is admitted to the hospital, and a plan for the educational component becomes an official part of the multi-disciplinary treatment plan supervised by the treating physician. Entrance to an educational program is by doctor's order, and progress is documented on the patient's medical chart. The hospitals consider the educational services, which are supervised by the hospitals' medical staffs rather than the local school boards, as clinical services.

■ The Secretary does not argue that Dr. Moore is not a qualified expert. Nor did she present any experts of her own. Throughout the proceedings, the Secretary has contended that education is not treatment, but she has failed to provide any evidence—testimonial or documentary—to support this contention. The Secretary relies instead on a section of the Provider Reimbursement Manual that contains her own interpretation of the Medicare regulations. The Manual provides:

*Vocational and Scholastic Training Expense—*

The costs attributable to vocational, scholastic, or similarly oriented training activities conducted by providers on behalf of patients are not allowable costs. For example, costs incurred by a psychiatric facility in operating an elementary or secondary school for patients are unallowable costs.

Medicare Health Insurance Manual No. 15 § 2104.5 (Rev.199 April 1978).

■ As the Secretary concedes, the manual provision is not evidence. Moreover, we see no reason why we should accept her opinion, as expressed in the manual provision, rather than that of the medical expert. Defining what is necessary medical treatment does not appear to be one of those areas in which the Secretary has sufficient expertise that we should give unbridled deference to her interpretation. *Cf. Advanced Health Systems,* 510 F.Supp. at 968–69 (alcoholism expert's opinion of what services were related to treatment, rather than the Secretary's interpretation of regulation, considered determinative in Medicare reimbursement case). Outside of the Medicare context, in related areas,

---

**3.** As Vista Hill points out, this is not the appropriate standard for determining whether costs are "necessary and proper" under 42 C.F.R. § 405.451(a) (1984); the regulations require only that the costs be "appropriate and helpful," *id.* § 405.451(b)(2). The regulation itself lists as reimbursable a number of services that are not "integral" to therapy, such as room and board. Even costs that merely encourage prospective patients to seek treatment have been considered sufficiently related to patient care to be reimbursable. *See Advanced Health Systems, Inc. v. Schweiker,* 510 F.Supp. 965, 969 (D.Colo.1981) (costs of advertisements that encourage alcoholics to seek treatment are reimbursable) (citing *Advanced Health Systems, Inc. v. Califano,* No. C-77-2765 SW (N.D.Cal. Sept. 26, 1979), *appeal dismissed,* April 26, 1980) ).

courts have concluded that physicians, not administrative agencies, have responsibility for determining what constitutes necessary medical treatment. *See Beal v. Doe*, 432 U.S. 438, 445 n. 9, 97 S.Ct. 2366, 2371 n. 9, 53 L.Ed.2d 464 (1977) (physicians decide which abortions are medically necessary and therefore reimbursable under Medicaid); *Pinneke v. Preisser*, 623 F.2d 546, 550 (8th Cir.1980) ("The decision of whether or not certain treatment or a particular type of surgery is 'medically necessary,' [and therefore reimbursable under Medicaid] rests with the individual recipient's physician and not with clerical personnel or government officials."). In the Social Security disability-compensation context, the ALJ can reject the opinion of the claimant's physician on the ultimate issue of disability only by presenting clear and convincing reasons for doing so. *Coats v. Heckler*, 733 F.2d 1338, 1340 (9th Cir.1984); *Montijo v. Secretary of Health and Human Services*, 729 F.2d 599, 601 (9th Cir.1984).

In a recent case in this circuit the Secretary relied on a similar method of litigating a Medicare reimbursement issue, and was equally unsuccessful. In *Villa View Community Hospital, Inc. v. Heckler*, 720 F.2d 1086 (9th Cir.1983), the Secretary failed to present any evidence to support her contention that generally accepted accounting principles prohibited the amortization of the costs in question. *Id.* at 1094. Instead she attacked the credibility of the provider's expert witnesses. We refused to affirm an unsupported finding by the Secretary when the only evidence in the record supported the provider. *Id.; see also Saint Mary*, 718 F.2d at 473 (once hospitals presented evidence that Secretary failed to pay for necessary and appropriate services, Secretary had burden of presenting rebuttal evidence). In this case, the Secretary does not even attack Dr. Moore's credibility; she merely disagrees with his conclusions. Once again, we find the Secretary's mode of argument wholly unpersuasive.

■ Furthermore, in order to participate in the Medicare program Vista Hill is *required* to provide the educational services at issue. The Medicare regulations specify that a psychiatric hospital must meet the accreditation requirements of the Joint Commission for the Accreditation of Hospitals ("JCAH") to qualify for reimbursement. 42 C.F.R. § 405.1036(a) (1984). JCAH requires that psychiatric facilities provide hospitalized children with appropriate, individually tailored educational services of the sort provided here. *See* Joint Commission on Accreditation of Hospitals, *Accreditation Manual for Psychiatric Facilities Serving Children and Adolescents* 71–72 (1983) [hereinafter cited as *JCAH Manual*]. Accordingly, if Vista Hill did not provide the services, it would not qualify as a Medicare provider. Generally, whenever a hospital expenditure is required either for the hospital to operate, or for the hospital to be qualified as a Medicare service provider, the costs are reimbursable. *See, e.g., Annie M. Warner Hospital v. Harris*, 639 F.2d 961, 963 (3d Cir.1981) (dues payments necessary to secure continued insurance coverage, without which hospital could not legally operate, are a reimbursable cost); *Moody Nursing Home, Inc. v. United States*, 621 F.2d 399, 400 (Ct.Cl.1980) (costs of utilization review plan, without which skilled nursing home could not qualify as a Medicare provider, are apportionable costs under Medicare); *cf. Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788, 798–800 (D.C.Cir. 1984) (questioning the exclusion of malpractice insurance costs from apportionment as routine costs in light of the fact that malpractice insurance is required).

The JCAH standards mandating educational services, as well as Dr. Moore's testimony, make it clear that the services provided by Vista Hill are related to treatment. In addition to discussing the academic achievement goals of such services, the JCAH standards note both the therapeutic considerations involved in providing them and the therapeutic objectives they serve. *JCAH Manual, supra* p. 9, at 71. According to the legislative history of the Medicare Act itself, the reason hospitals are required to comply with JCAH requirements is to ensure that providers will satis-

fy. professionally established treatment norms. *See* S.Rep. No. 404, 89th Cong., 1st Sess. 29, *reprinted in* 1965 U.S.Code Cong. & Ad.News. 1943, 1970.

Because psychiatric treatment for children must, medically and legally, include the type of educational services provided by Vista Hill, the costs of those services are "necessary and proper." There is no evidence to support the PRRB's conclusion that they are not related to treatment. To the extent the Board's determination is based on its conclusion that the educational services are not "an integral part of the therapy modality," we find it to be arbitrary and capricious. Thus, we cannot affirm the PRRB's denial of reimbursement on the first ground on which it relied in reaching its decision.

## IV. THE RESPONSIBILITY OF LOCAL GOVERNMENTS FOR PROVIDING PUBLIC EDUCATION

■ The PRRB also determined that the costs of the educational services are not reimbursable because local school districts, not the providers, are responsible for furnishing public education. According to the Secretary, *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny delineate a federal policy of exclusive state and local government responsibility for public education and thus preclude the imposition of the costs of providing these services on the

Medicare system.[4] This argument is erroneous for several reasons. First, it begs the question because it assumes that the services provided by Vista Hill are simply "education" of the sort at issue in *Brown.* The Secretary gives us no indication why the local school districts should be deemed responsible for providing the educational *treatment* at issue here and, in fact, conceded during oral argument that if the education programs constitute medically necessary services, the costs of those programs would qualify as routine costs reimbursable under Medicare.

If we were to accept the Secretary's argument, we would be forced to conclude that local school districts are responsible for all necessary medical costs incidental to providing education for psychiatrically hospitalized children, although the determination of when local school districts must bear these costs and what services they must provide is made by the treating hospitals and physicians. The Secretary offers no statutory or other authority for this proposition. In the absence of persuasive authority we would be reluctant to reach a conclusion that would have so significant an impact upon local government.[5]

Moreover, the uncontroverted evidence in the record indicates that neither the states nor the local school districts are in fact providing the medically related educational programs at issue here. If the states and

4. The Secretary ignores the fact that other federal government actions substantially undercut this notion of exclusive local government responsibility for providing public education or at least of exclusive local government financial responsibility. For example, in the Education for All Handicapped Children Act ("EHCA"), 20 U.S.C. § 1401 *et seq.* (1982), the federal government has created a federal grant program under which it reimburses states for providing education to handicapped children if the services meet specified federal requirements.

5. Some state regulations mandating provision of education to handicapped children, *see, e.g.,* Cal. Ed.Code §§ 56360–56381 (West Supp.1985); New Mexico Stat.Ann. § 43–1–18 (1978), as well as the EHCA, *see supra* note 4, impose upon the states and local school districts the responsibility for providing education to handicapped children. Federal funding is available for services

provided in accordance with the requirements of the EHCA. It is conceivable that, in practice, the education mandated for handicapped children by these statutes is identical to the medically related services that the JCAH requires be provided for the children at hospitals like Vista Hill. However, the Secretary does not make this argument, and neither the fiscal intermediary nor the PRRB suggested that such statutes constitute a source of local government responsibility. Moreover, there is no way we could determine, without expert testimony, whether the requirements imposed by the two sets of statutes are, in practice, identical or even similar. Therefore, we do not consider here what obligation, if any, the state may have under EHCA or any state statutes or regulations, to provide any or all of the educational services at issue.

local school districts did in fact provide these services, Medicare reimbursement would be precluded whether or not they were required to do so. *See* 42 U.S.C. § 1395y(a)(3) (1982); 42 C.F.R. § 405.312 (1984). Providers may not receive payment for services furnished by a governmental entity. In contrast, there does not seem to be any statutory or other authority for the proposition that if local school districts are responsible for providing these services, but fail to live up to their responsibility, the services are not reimbursable under Medicare.[6]

Vista Hill concedes that the state and local school districts do, in fact, assist in the provision of educational services by supplying some teachers and some materials. However, Vista Hill seeks Medicare reimbursement only for those portions of the educational treatment expenses that *it* incurs as a result of *its* provision of services over and above those provided by the local school districts. Vista Hill does not seek reimbursement for the salaries of teachers or the cost of materials that are provided by the school districts. It asks merely that Medicare assume its share of the costs of, for example, (1) the specially trained teachers that the school districts do not supply, (2) the personnel necessary to provide educational services over the summer when public schools do not function, and (3) the specialized facilities and supplies that are not made available by the public school districts. The fact that states and local school districts provide certain components of the medically necessary educational services to the young Vista Hill patients has no bearing whatsoever on Medicare's obligation to bear its share of the cost of the other components.

There is no legal basis for the PRRB's conclusion that reimbursement for the edu-

cational services at issue is barred because it is the responsibility of local school districts to provide the services. To the extent that the Board's determination is based on that conclusion, we find it to be contrary to law. Accordingly, we cannot affirm the PRRB's denial of reimbursement on the second ground on which it relied in reaching its decision.

## V. THE MEDICARE APPORTIONMENT SYSTEM

In affirming the PRRB's refusal to approve reimbursement, the district court did not rely on either of the grounds on which the PRRB based its decision. Instead, it relied on an entirely different argument. The district court reasoned that because the educational services at issue are not used by Medicare patients, the costs of those services are not "routine costs" for *Medicare patients.* Therefore, the district court concluded, the costs cannot be allocated according to the procedures used to allocate routine costs, i.e., apportioning the costs between Medicare patients and non-Medicare patients on the basis of the total number of patient days spent in the hospital by each category of patient. The district court did not say whether the costs should be allocated in the manner non-routine costs are allocated, i.e., on the basis of actual patient usage.

Because the PRRB did not rely upon the district court's reasoning, we could not affirm the Board's decision even if we found it persuasive, *see Mercy Hospital and Medical Center, San Diego v. Harris,* 625 F.2d 905, 906 n. 2 (9th Cir.1980); *supra* p. 4. However, since the Secretary has adopted the district court's reasoning on appeal and has relied upon it heavily, we

---

**6.** In her brief the Secretary relied only on an amorphous "federal policy" that purportedly precludes reimbursement where there is an obligation on the part of local government to provide a particular service. We believe that in so highly regulated an area, with so complex a statute and so many detailed regulations, it would be inappropriate for us to imply a "policy" governing so specific an aspect of the regu-

latory scheme. The Secretary's failure to point, in her brief, to any provision of the statute or portion of the regulations implementing any such "federal policy" compels us to reject her contention. We note that during oral argument the Secretary did cite 42 U.S.C. § 1395y(a)(2) (1982). We reject this belated effort both on procedural and substantive grounds. *See* 42 C.F.R. § 405.311 (1984).

believe it merits some discussion. *Cf. Mercy Hospital*, 625 F.2d at 905 n. 2 (addressing district court's reasoning, although not related to ground relied upon by PRRB, because panel disapproved reasoning and district court's decision was reported). While the position the Secretary urges before us has·some superficial appeal and, at first blush, may seem reasonable, a closer examination demonstrates that it is clearly contrary to the language and purpose of her own regulations as well as her own past practices.

Congress left to the Secretary the responsibility of devising cost-apportionment procedures that would ensure that costs generated by Medicare patients would not be shifted to non-Medicare patients and vice versa. 42 U.S.C. § 1395x(v)(1)(A) (1982). The Secretary's apportionment formulas are designed to accomplish this. In general, the costs of "routine services" (e.g., room, food, nursing care, minor medical and surgical supplies) are allocated to Medicare by multiplying a hospital's total routine costs attributable to all patients by the percentage of *patient-days* attributable to Medicare patients. The costs of ancillary services (e.g., x-ray, laboratory) are allocated to Medicare by multiplying the total costs of all patient use of a particular ancillary service by the percentage of those costs that are attributable to *actual usage* by Medicare patients. 42 C.F.R. § 405.452 (1984).

Costs are deemed to be "ancillary" and apportionable on a usage-related basis only if they are for services for which separate charges are customarily made. *See* 42 C.F.R. § 405.452(b) (1984). Routine services include "the use of equipment and facilities for which a separate charge is not customarily made." *Id.; see also Mercy Hospital*, 625 F.2d at 909–10 & n. 6 (ex-

plaining that reimbursement calculations for the same kinds of services differ depending on the hospital's billing practices). Routine costs include, *inter alia*, those costs generated by the provision of services to pediatric and maternity patients [7] who are as unlikely to be Medicare patients as are the children hospitalized at Vista Hill. *See generally Saint Mary*, 718 F.2d at 462 & nn. 4, 7 (apportionment formulas); *John Muir Memorial Hospital, Inc. v. Davis*, 559 F.Supp. 1042, 1045 (N.D.Cal.1983) (explanation of apportionment procedures), *aff'd*, 726 F.2d 1443 (9th Cir.1984).

The key to the Secretary's system of allocating costs is·hospital billing practice. The determinative factor in classifying costs as routine is their inclusion as part of a regular daily overall charge. Thus, all patients share equally in the costs of all routine services whether or not they receive any particular routine service, and and regardless of the quantity of routine services they actually use.[8] The per diem basis on which routine-service costs are apportioned "assumes that all patients receive roughly the same services per day at roughly the same cost per patient. Everyone knows that this is not true in individual cases, but for reasons of administrative simplicity it is assumed that the extreme divergences from the mean balance out." *Saint Mary*, 718 F.2d at 471; *accord Boswell Memorial Hospital*, 749 F.2d at 794–95.

Based on the averaging concept, the Secretary has consistently and successfully argued that routine costs must be apportioned among Medicare and non-Medicare patients alike on a per diem basis, even when the costs in question are generated *entirely* by Medicare patients. For example, under the Secretary's apportionment

---

**7.** As ancillary-department costs, labor and delivery costs are billed separately and are apportioned on a usage basis. Medicare thus pays for few of these costs. The routine care provided to maternity patients when they are outside the labor and delivery area, i.e., before going into labor and after the delivery, are apportioned as routine costs. *See John Muir*, 559 F.Supp. at 1045–46.

**8.** Routine costs are calculated separately for general care areas and intensive care-type units. Within each of these areas, the routine costs are apportioned on a per diem basis. *See Saint Mary*, 718 F.2d at 462; 42 C.F.R. § 405.452(b) (1984).

scheme as currently applied, the administrative costs of completing Medicare forms and other costs of maintaining Medicare records acceptable to the Secretary are allocated to all patients on a per diem basis. As a result Medicare pays only a portion of these costs. The rest is allocated to non-Medicare patients. *See, e.g., Suburban Hospital (Louisville, Ky.) v. Blue Cross and Blue Shield Association,* [May 1984–Dec. 1984 New Developments Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 33,978, at 9354, 9361, 9365, 9366 (PRRB Dec. 16, 1983), *aff'd without opinion as to this issue,* [May 1984–Dec. 1984 New Developments Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 33,979, at 9366, 9367 (HCFA Admr. Feb. 3, 1984). The same holds true when the costs in question are for services that *primarily* benefit Medicare patients. There, too, non-Medicare patients may be allocated a very substantial portion of the costs. *See Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 814 (D.C.Cir.1981) (Secretary has discretion to classify intermediate care units that primarily serve older people as routine care areas—rather than special care areas—even though the resultant shifting of costs from Medicare to non-Medicare patients may discourage both the provision of these services and innovation in the treatment of older people); *see also Villa View Community Hospital, Inc. v. Heckler,* 728 F.2d 539, 543 (D.C.Cir.1984) (decision to classify intermediate care units as routine care areas well within Secretary's statutory authority, although it may discourage the development of more cost-efficient patient care units); *White Memorial,* 640 F.2d at 1129 (same).

The Secretary argues that the educational services at issue in this case should not be considered "routine costs" because they are unlikely to be used by Medicare patients. However, as the cases we have discussed and the Secretary's regulations clearly demonstrate, that is not the test. The services in question are not billed separately. They are included in the daily overall hospital charge. Therefore, under the apportionment system adopted by the Sec-retary the costs of the services constitute "routine costs."

The Secretary's efforts to avoid the force of her own regulation violates not only the requirements of the regulation but the provisions of the Medicare Act itself. For the exclusion of these services from "routine costs" to be consistent with the Medicare Act's prohibition on cost-shifting between Medicare and non-Medicare patients, 42 U.S.C. § 1395x(v)(1)(A) (1982), the costs of analogous services used primarily by Medicare patients and infrequently, if at all, by the hospitalized children would also have to be excluded, and allocated on a usage basis. During the time that the children receive educational services, elderly patients may be involved in attendant-supervised occupational or recreational therapy, including playing checkers or chess, sewing, weaving, or attending movies. Medicare Health Insurance Manual No. 10 § 210.9(D) (Rev. 260 July 1981 & Rev. 310 Aug. 1982) expressly provides reimbursement for these activities, and their costs are reimbursed as "routine costs." The Secretary does not agree that these occupational or recreational therapy services—or any other services used heavily by Medicare patients—should be apportioned on a usage basis. Accordingly, the Secretary's argument constitutes an attempt to rely on her regulations and apportionment system when they reduce her reimbursement liability, and to ignore the procedures mandated by her apportionment system when they increase her reimbursement liability. *See Boswell Memorial Hospital,* 749 F.2d at 798–99 (describing contexts in which Secretary has adopted such inconsistent positions).

The Secretary has broad discretion under the Act to define "reasonable costs" and to determine how most efficiently to estimate and allocate costs so that the costs of the Medicare system are not borne by non-Medicare patients and vice versa. 42 U.S.C. § 1395x(v)(1)(A) (1982). It is not for us to decide whether the Secretary's regulations constitute the best method of accomplishing this goal, *see Villa View Com-*

*munity Hospital, Inc. v. Heckler,* 728 F.2d 539, 543 (D.C.Cir.1984) (quoting *Psychiatric Institute,* 669 F.2d at 814), and we express no view on the wisdom of the Secretary's current apportionment system. All we decide is that in view of the regulations she has chosen to adopt, the Secretary may not deny reimbursement for the educational services at issue in this case.

We would add one comment regarding the current regulations. The Secretary has chosen to follow a system that is based on the assumption that disparity of usage in particular categories of services balances out over the long haul. Whether in the end Medicare will come out ahead, behind, or even as a result of this method of apportioning of costs we cannot say here. There is certainly nothing in the record that would help us do so. However, if it turns out that the disadvantages to the Medicare program of continuing to use the present method of cost allocation outweigh the advantages or that the policies of the Act are being frustrated by the use of that method, we assume the Secretary will amend her regulations or be told to do so by the Congress. *See Boswell Memorial Hospital,* 749 F.2d at 795 (if the Secretary determines that the general and administrative services pool, taken as a whole, has come to subsidize non-Medicare patients at the expense of Medicare patients she can institute regulations that segregate costs so that apportionment is based on usage). In the meantime, the Secretary has no choice but to follow the rules she has adopted.

## VI. CONCLUSION

There is no evidence to support the PRRB's finding that the educational services in question are unrelated to medical treatment, and neither the Board nor the Secretary has offered any statutory or other authority in support of the Board's conclusion that the local school districts are required to provide those services. Moreover, the Secretary could lawfully deny reimbursement only if the school districts actually did provide the services, and there is no serious contention that they do. Because Medicare must reimburse the costs of all services that are necessary and properly incurred in providing medical treatment, we reverse the Secretary's determination that the costs of the educational services at issue are not reimbursable. We remand so that the district court may enter an order of summary judgment in favor of Vista Hill.[9]

REVERSED AND REMANDED.

WIGGINS, Circuit Judge, concurring in part and dissenting in part:

The question of interest to the parties in this case is whether the appellant hospital is entitled to reimbursement from the Medicare program for costs incurred by the

---

9. Our concurring and dissenting colleague agrees that the reasons relied on by the Secretary in the administrative proceeding for refusing to pay appellant's claim were without merit. However, he suggests that under *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we must now remand to the PRRB so that it can consider a new argument concerning routine costs subsequently raised by the district court. As we have shown, this new argument also provides no basis for the Secretary's arbitrary refusal to reimburse Vista Hill. The Supreme Court has pointed out that *"Chenery* does not require that we convert judicial review of agency action into a ping-pong game." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969) (plurality opinion). A remand is not required when it "would be an idle and useless formality," *id.,* as indeed it would be in this case.

We should make it plain that there is nothing novel about our actions. We have often failed to remand for redetermination of the merits when we have found an administrative action to be arbitrary, and have previously followed the precise course we follow here in a number of cases in which the Secretary erroneously refused to allow reimbursement of costs in connection with medical services. *See Villa View Community Hospital v. Heckler,* 720 F.2d 1086 (9th Cir.1983) (reversal of PRRB disallowance of certain costs; remand for sole purpose of determining exact amount of such costs); *Memorial, Inc. v. Harris,* 655 F.2d 905 (9th Cir. 1980) (same); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9th Cir.1980) (same). Our remand here does not preclude the PRRB from making determinations as to the precise amount of the erroneously disallowed costs.

hospital in providing educational services to school-age patients undergoing treatment for various psychiatric disorders. A different question is before this court. We must decide whether the decision of the Provider Reimbursement Review Board (PRRB) was arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with law. *See Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 130 (9th Cir.1980).

In making this decision, we are limited to a review of the adequacy of the reasons tendered by the PRRB for its actions. *Cf. Moapa Paiute Ind. v. U.S. Dept. of Int.,* 747 F.2d 563, 566 (9th Cir.1984) (Secretary's ruling upheld if reason given by agency is valid). I concur in the judgment of reversal because the reasons advanced by the PRRB for its action do not withstand proper scrutiny. I dissent from the conclusion of the court that reimbursement is required. Such conclusion rests upon reasons which were not considered by the PRRB.

The hospital's claim for reimbursement was first considered by the fiscal intermediary, which denied the claim on the basis of explicit language found in the Health Insurance Manual.[1] The hospital appealed that determination to the PRRB, which also denied the claim, although for different reasons. The PRRB based its decision on alternative grounds. It concluded that the claim of the hospital was not for necessary and proper costs in rendering medical services because (1) "education is not an integral part of the therapy modality" for children suffering psychiatric disorders, and (2) provision for education is the responsibility of local school districts, and not the Medicare program. The decision of the PRRB became the decision of the Secretary when her designee, the Deputy Administrator of the Health Care Finance Administration, declined to review that decision. 42 U.S.C. § 1395oo (f)(1).

Appeal was taken by the hospital to the district court. In an unreported decision, that court affirmed the conclusions reached by the administrative agency, but for wholly different reasons. In the view of the district court, educational expenses for the exclusive benefit of non-Medicare patients were not "routine costs" and therefore not subject to apportionment among all patients.

Our review is of the final action of the PRRB and not the decision of the district court. Our standard of review requires us to conduct the same inquiry, *de novo,* which the district court should have conducted, but did not. At the outset of its opinion, this court properly recognizes its limited review authority. It applies the substantial evidence test to the agency's first declared reason for denying reimbursement, namely, that education was not an integral part of the treatment modality for children suffering from mental disorders. The court correctly concludes that the record in this case does not contain substantial evidence supporting the agency's factual determination. Likewise, the majority properly concludes that the second declared reason of the administrative agency was incorrect as a matter of law and cannot support its ultimate conclusion.

I join the majority in these two conclusions. The weight of the evidence clearly established that educational services are customarily provided as a part of the treatment regimen for children suffering from psychiatric disorders. With respect to the second ground for its decision, the legal error of the administrative agency in determining that education was the responsibility of state government stemmed from its fixation on education as an exclusive state function in which the Medicare program is uninvolved. It is true that states bear the primary burden of education, but in those rare cases in which education is an essential part of necessary medical treatment, the Medicare program may be responsible for reimbursement for educational expenses in a proper case.

1. *See* Department of Health and Human Services, Health Care Financing Administration, *Provider Reimbursement Manual,* Part I, § 2104.5 (1983).

The court should have restricted itself to reversing and remanding this case to the PRRB for further proceedings on the basis that the reasons for its action are not supportable. It did not do so. Rather, the majority opinion goes to great lengths to advance its own view of the substantive issue in this case. For example, after finding that no substantial evidence supported the agency's view that education was not treatment, the court gratuitously observes that "In order to participate in the Medicare program, Vista Hill is *required* to provide the educational services at issue." At 561.[2]

The most unfortunate example of the court violating its limited role in reviewing actions of administrative agencies is Part V of the court's opinion, entitled "The Medicare Apportionment System." The court concedes that it was the district court, not the administrative agency, that raised the issue of whether the cost of educational services were subject to apportionment at all. It believes that the district court's opinion "merits some discussion," citing *Mercy Hospital and Medical Center v. Harris*, 625 F.2d 905 (9th Cir.1980). There we chose to address new issues raised by the district court and not considered by the administrative agency because the district court's opinion had been reported. *Id.* at p. 906, n. 2. There is no similar excuse in the instant case for exceeding the proper limits of judicial review.

Having justified "some discussion" of the substantive issue of whether costs incurred by non-Medicare patients for educational services should be borne in part by the Medicare system, the court proceeds to *decide* the substantive issue by stating that "[I]n view of the regulation she has chosen to adopt, the Secretary may not deny reimbursement for the educational services at issue in this case." At 566.

It is not our function to decide whether reimbursement to the hospital is required. That issue is not implicated in this appeal and a discussion of my view with respect to that issue is no more appropriate in this dissent than it is in the majority opinion.

The court has exceeded the bounds of appellate review of administrative action. For almost forty years it has been understood that a reviewing court could *affirm* the decision of an administrative agency only upon the basis articulated by it for its decision. *See Securities Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). The reason for this salutory rule is rooted in Separation of Powers principles. Congress by law has delegated authority to agencies of its own creation. Congress has not vested the courts with the power to oversee the wisdom of administrators of such Executive Branch agencies; rather, Congress, under its authority to prescribe the jurisdiction of federal courts, has expressly withheld that authority. A court which purports to substitute its discretion for that of an administrator trenches upon the authority of the Executive Branch. When a judicial affirmance is based upon a ground not considered and adopted by an agency, the court improperly arrogates decisional authority to itself, for there can be no assurance that the agency would have reached the *same* conclusion for *different* reasons. *See* H. Friendly, *The Limited Office of the Chenery Decision*, 21 Ad.L. 1, 5 (1968).

Similarly, when a reviewing court *reverses* the decision of an administrative agency because of the factual or legal inadequacy of its reasons, it has exhausted its powers. It may not proceed to advise the agency as to what reasons or conclusions it must adopt upon remand. To do so is not a

---

**2.** The court is wrong in its dicta. Admittedly, a hospital providing psychiatric treatment to Medicare patients must be accredited by the Joint Commission for the Accreditation of Hospitals (JCAH) to qualify for reimbursement; and the JCAH requires, as a condition of accreditation, that educational services be provided to children receiving psychiatric care. Nevertheless, these admitted facts do not bear on, much less resolve, the issue here. To say that education is a necessary and proper service to be delivered to a child undergoing psychiatric treatment does not, in itself, bring that child within the Medicare Act so as to entitle the provider of that service to reimbursement from the Medicare program.

judicial prerogative, for any gratuitous advice by a court to an agency to take particular action for reasons deemed persuasive to the court also trenches upon discretionary authority reserved to the Executive Branch. *See Central DuPage Hosp. v. Heckler,* 761 F.2d 354, 359 (7th Cir.1985) (even where Secretary's new theory is "post hoc rationalization", she is entitled to remand to enable agency to consider it).

These rules of limited review are fundamental to administrative law. The majority, however, has chosen not to follow them and for that reason, I dissent.